## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

BEVERLY GROSS AND KRISTA BIEHL, *individually and on behalf of all others similarly situated*,

    Plaintiffs,

    v.

BLUECHIP FINANCIAL d/b/a SPOTLOAN, JAMIE AZURE, CHAIRMAN OF TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *in his official capacity*; LYNN GOURNEAU, VICE CHAIRMAN OF TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *in his official capacity*; STUART LAFOUNTAIN, SECRETARY OF TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *in his official capacity*; JIM BAKER, DISTRICT 1 COUNCIL REPRESENTATIVE FOR TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *in his official capacity*; NATHAN DAVIS, DISTRICT 1 COUNCIL REPRESENTATIVE FOR TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *in his official capacity*; RON TROTTIER, DISTRICT 2 COUNCIL REPRESENTATIVE FOR TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *in his official capacity*; LOANN JEROME, DISTRICT 3 COUNCIL REPRESENTATIVE FOR TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *in her official capacity*; CARSON BELGARDE, DISTRICT 4 COUNCIL REPRESENTATIVE FOR TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *in his official capacity*; CHAD COUNTS, DISTRICT 4 COUNCIL REPRESENTATIVE FOR TURTLE MOUNTAIN BAND OF CHIPPEWA

Case No. _____

September 26, 2019

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

- 1 -

INDIANS, *in his official capacity*;

    Defendants.

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs Beverly Gross and Krista Biehl, *on behalf of themselves and all individuals similarly situated* ("Plaintiffs"), by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## GENERAL ALLEGATIONS

1.      This is a case about a scheme to make online short-term loans (commonly called "payday loans") that carry triple-digit interest rates, often exceeding 400%, and that are illegal in many states.

2.      Payday loans often target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.      In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws.

4.      In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

5.      Federal banking regulators shut down these "rent-a-bank" schemes. Michael A.

Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC PERSPECTIVES 169, 178-9 (2007)

(describing rent-a-bank scheme and regulatory reaction).

6.      Some payday lenders have since developed a new method to attempt to avoid

state usury laws—the "rent-a-tribe" scheme.

7.      In a rent-a-tribe scheme, the payday lender—which does most of its lending over

the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and

state law by piggy-backing on the tribe's sovereign legal status and its general immunity from

suit under federal and state laws.

8.      Like its predecessors, this scheme is doomed to fail because it is well established

that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries

have generally been held subject to non-discriminatory state law otherwise applicable to all

citizens of the State." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019) (quoting

*Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973)).[1] This principle includes state's

usury and licensing statutes. *Gingras*, 922 F.3d at 121 (finding that a rent-a-tribe enterprise was

"engaged in conduct outside of Indian lands when they extended loans to the Plaintiffs in

Vermont.").

---

[1] *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144, n. 11 (1980) (reaffirming this principle from *Mescalero Apache Tribe*); *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 113 (2005) (same); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (same); *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465 (1995) (same).

9.      In recent years, these rent-a-tribe schemes have come under increasing scrutiny from regulators, with one prominent perpetrator convicted and sentenced to 16 years in prison related to federal racketeering and truth-in-lending laws.[2]

10.     This case is about one such enterprise involved in the tribal lending business model. In this case, non-tribal entities ZestFinance and Douglas Merrill provided the capital, marketing, underwriting, and other resources for BlueChip Financial dba Spotloan ("BlueChip"), a purportedly tribal entity in North Dakota that makes usurious loans to persons located throughout the United States.

11.     In February 2014, in response to a cease and desist issued to BlueChip by the Connecticut Department of Banking, BlueChip represented that it would stop making loans to Connecticut residents.[3]

12.     BlueChip did not stop making loans to Connecticut residents.

13.     In June 2018, the Connecticut Department of Baking issued a cease and desist order to BlueChip for violating Connecticut law by making usurious loans without a license with interest rates in excess of 12% and ordered repayments of illegal interest paid to Connecticut residents. Based on Plaintiffs' experiences, no repayments have been made.

14.     Plaintiffs, on behalf of themselves and the Classes set forth below, seek to recover damages against BlueChip for its violations of state and federal law. Plaintiffs also seek prospective injunctive and declaratory relief against the Turtle Mountain Band of Chippewa

---

[2] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

[3] https://portal.ct.gov/DOB/Enforcement/Consumer-Credit-2018-Orders/BlueChip-Financial---Temp-CD-Rest-NOI-CD-CP.

Indian's Tribal Council to prevent their continuous and ongoing violations of state and federal law.

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

16.    This Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs are citizens of Connecticut, at least one Defendant is not a citizen of Connecticut, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Connecticut. Additionally, venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants transacted their affairs in this District.

## THE PARTIES

18.    Plaintiff Beverly Gross is a natural person and resident of Connecticut.

19.    Plaintiff Krista Biehl is a natural person and resident of Connecticut.

20.    Defendant BlueChip Financial dba Spotloan is a purportedly tribal corporation located in Belcourt, North Dakota, and incorporated under the laws of the Turtle Mountain Band of Chippewa Indians.

21.    Defendant Jamie Azure is the Tribal Chairman of the Turtle Mountain's Tribal Council. Defendant Azure is also Chair of the BlueChip Board. Plaintiffs seek relief from Defendant Azure in his official capacity only.

22. Defendant Lynn Gourneau is the Vice Chairman of the Turtle Mountain's Tribal Council. Plaintiffs seek relief from Defendant Gourneau in his official capacity only.

23. Defendant Stuart LaFountain is the Secretary of the Turtle Mountain's Tribal Council. Plaintiffs seek relief from Defendant LaFountain in his official capacity only.

24. Defendant Jim Baker is a District 1 Council Representative for Turtle Mountain's Tribal Council. Plaintiffs seek relief from Defendant Baker in his official capacity only.

25. Defendant Nathan Davis is a District 1 Council Representative for Turtle Mountain's Tribal Council. Plaintiffs seek relief from Defendant Davis in his official capacity only.

26. Defendant Ron Trottier is the District 2 Council Representative for Turtle Mountain's Tribal Council. Plaintiffs seek relief from Defendant Trottier in his official capacity only.

27. Defendant LoAnn Jerome is the District 3 Council Representative for Turtle Mountain's Tribal Council. Plaintiffs seek relief from Defendant Jerome in her official capacity only.

28. Defendant Carson Belgarde is a District 4 Council Representative for Turtle Mountain's Tribal Council. Plaintiffs seek relief from Defendant Belgarde in his official capacity only.

29. Defendant Chad Counts is a District 4 Council Representative for Turtle Mountain's Tribal Council. Plaintiffs seek relief from Defendant Counts in his official capacity only.

## STATE USURY AND LICENSING LAWS[4]

### A.   Connecticut

30.     Without obtaining "a small loan license" from the Commissioner of Connecticut's Department of Banking, "no person shall, by any method, including but not limited to, mail, telephone, Internet or other electronic means" make "a small loan to a Connecticut borrower," "[o]ffer, solicit, broker, directly or indirectly arrange, place or find a small loan for a prospective Connecticut borrower," or "[r]eceive payments of principal and interest in connection with a small loan made to a Connecticut borrower[.]" Conn. Gen. Stat. Ann. § 36a-556(a)(1)-(2), (4).

31.     A "small loan" is defined as "any loan of money or extension of credit" where: "(A) The amount or value is fifteen thousand dollars or less; and (B) the APR is greater than twelve percent." Conn. Gen. Stat. Ann. § 36a-555(11).

32.     If a person fails to obtain a license prior to making a small loan, "[s]uch small loan shall be void and no person shall have the right to collect or receive any principal, interest, charge or other consideration thereon." Conn. Gen. Stat. Ann. § 36a-558(d)(1).

33.     In addition, even when a person obtains a small loan license, Connecticut law prohibits the charging of an annual percentage rate ("APR") of 36% for loans under $5,000.00. Conn. Gen. Stat. Ann. § 36a-558(d)(1).

34.     BlueChip was never licensed to make consumer loans in Connecticut, rendering each of the loans made to Plaintiffs and class members void.

---

[4] Usury laws are not unique to the United States of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

35.     Additionally, even if they were licensed, BlueChip's loans far exceed the 36% cap provided in Conn. Gen. Stat. Ann. § 36a-558(d)(1).

**B.      Florida**

36.     In Florida, the maximum allowable rate of interest on loans of $500,000 or less is eighteen percent (18%). Fla. Stat. § 687.03.

37.     Florida makes it either a misdemeanor or felony—depending on the interest rate—to charge usurious interest in excess of twenty-five percent (25%). Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

38.     Lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2).

39.     Under Florida law, consumers can recover twice the amount of usurious interest paid on illegal loans. Fla. Stat. § 687.04.

40.     BlueChip was never licensed to make consumer loans in Florida.

**DEFENDANTS' SCHEME TO AVOID USURY LAWS**

41.     Defendants operate a rent-a-tribe scheme that charges up to 490% annual interest on short term loans. *See* www.spotloan.com/how-spot-loans-work.

42.     In 2009, former Google Chief Information Officer Douglas Merrill founded ZestFinance, which was then known as ZestCash, and which is now known as Spotloan.

43.     ZestFinance wants to "reinvent[] the process of giving loans" and "to apply Google-like math to reinvent how credit decisions are made." *See* www.zestfinance.com/our-team.

44.     ZestCash, using its proprietary underwriting software, began making high-interest loans over the internet.

45.     By mid-2012, ZestCash was rebranded as "Spotloan."

46.     In an effort to attempt to avoid state usury laws, in 2012, Merrill and ZestFinance affiliated with the Turtle Mountain Band of Chippewa Indians (the "Tribe") located in Belcourt, North Dakota.

47.     At the direction of Merrill and ZestFinance, a tribal entity, BlueChip Financial, was created to serve as a front to disguise ZestFinance and Merrill's role in making usurious loans.

48.     BlueChip immediately began making loans using the "Spotloan" tradename.

49.     Under the scheme, loans are made in the name of "Spotloan c/o BlueChip Financial," but ZestFinance and Merrill provide the infrastructure to market, fund, underwrite, and collect on the loans, including the underwriting software.

50.     ZestFinance and Merrill have received significant financing from Victory Park Capital Advisors, a hedge fund that has funded other rent-a-tribe payday lending schemes.[5]

51.     The primary lending and collection operations of BlueChip are not operated on tribal land or on tribal property. For example, payments on the loans are not made to BlueChip on tribal lands, but instead are sent to a PO Box located in Palatine, Illinois. Further, BlueChip's CEO works in San Diego, California.

---

[5]   *See*   www.foxbusiness.com/features/think-finance-bankruptcy-exposes-fallout-with-victory-park-capital.

52.     The Tribe has little or no control over how the loans are financed or underwritten. ZestFinance provides all of the underwriting services for the loans.

53.     The Tribe receives only about 1% of the profits from the lending activities while 99% of the profits go to ZestFinance and other non-tribal entities.

54.     Despite not being operated or controlled by the Tribe, Defendants purport to represent to consumers that state laws designed to protect consumers from usurious loans do not apply to their loans from Defendants.

55.     For example, Defendants' form loan agreements state that: "By signing this Loan Agreement, you agree that the laws of the Tribe will apply to the Loan Agreement, and understand that United States state law does not apply to the Loan Agreement in any way."

56.     This scheme has been very successful. Defendants have made over 500,000 loans since 2012.

57.     In January 2014, the Connecticut Department of Banking notified BlueChip that BlueChip was "acting as a small loan lender in Connecticut" and requested that BlueChip cease and desist from all lending and collection activity in Connecticut.

58.     In February 2014 by letter, BlueChip's Chairman of the Board of Directors represented to the Connecticut Department of Banking that BlueChip would no longer make loans to Connecticut residents.

59.     BlueChip did not honor its word and continued to make loans to Connecticut residents.

60.     In June 2018, the Connecticut Department of Banking issued an order against Spotloan, ordering it to cease and desist lending in Connecticut, and ordered Spotloan to pay restitution for all illegal interest and pay a civil penalty. No restitution has been made.

61.    Connecticut is not alone in attempting to stop BlueChip's illegal lending. In 2016, BlueChip was ordered to cease and desist from lending in Illinois by the Illinois Department of Financial and Professional Regulation for not having a license to lend in Illinois.[6] The Washington Department of Financial Institutions has also found that BlueChip violated Washington law for lending without a license.[7]

## THE TRIBAL OFFICIALS' ROLE IN THE ENTERPRISE

62.    The Turtle Mountain Tribal Council serves as the Tribe's governing body and has the power to make laws and ordinances pursuant to the Turtle Mountain Constitution.

63.    Pursuant to Article IX of Turtle Mountain's Constitution, the Tribal Council is vested with all powers, including the express power to regulate and license "all business and professional activities conducted upon the reservation."

64.    Although Plaintiffs maintain that the Tribal Officials are not involved in the day-to-day management and operations of BlueChip, the Turtle Mountain Tribal Council's acquiescence in and facilitation of the illegal lending enterprise is a key component.

65.    Among other things, if the Tribal Council were enjoined from participating in the enterprise and collecting usurious amounts from consumers, it would effectively shut down the unlawful enterprise, including the ability of non-tribal participants to originate and collect on usurious loans through the tribal business model.

66.    Accordingly, it is within the Tribal Officials' power, as members comprising the Tribal Council, to shut down the operations of BlueChip, including to stop the unlawful collection of interest in Connecticut.

---

[6] *See* www.idfpr.com/DFI/CCD/Discipline/BluechipFinancialCDOrder.pdf.
[7] https://dfi.wa.gov/consumer/alerts/bluechip-financial-not-licensed-washington.

## PLAINTIFFS' EXPERIENCES

### A.   Plaintiff Beverly Gross

67.    On November 7, 2017, Plaintiff Gross obtained a loan with Spotloan.

68.    The principal amount of the loan was $600, and the interest rate was 490%.

69.    Plaintiff Gross repaid the loan in accordance with its terms, *i.e.*, by repaying $1,548.17 in less than six months.

70.    At the time she took out the loan, Plaintiff Gross resided in Stamford, Connecticut.

71.    Plaintiff Gross applied for the loan over the internet from her home computer, using her home address on the application.

72.    After she applied for the loan, she received an e-mail confirming approval for the loan and signed the contract from her residence in Connecticut.

73.    The loan was deposited directly into Plaintiff Gross's bank account that she maintains in Connecticut and all payments were automatically withdrawn from the same account.

### B.   Plaintiff Krista Biehl

74.    In the fall of 2017, Plaintiff Biehl obtained a loan with Spotloan.

75.    The principal amount of the loan was $400, and the interest rate was at least 300%.

76.    Plaintiff Biehl paid off the loan in 21 bi-weekly payments of $77 dollars, i.e., around $1,600 dollars.

77.    At the time she took out the loan, Plaintiff Biehl resided in Connecticut.

78.     Plaintiff Biehl applied for the loan over the internet from her home computer, using her home address on the application.

79.     After she applied for the loan, she received an e-mail confirming approval for the loan and signed the contract from her residence in Connecticut.

80.     The loan was deposited directly into Plaintiff Biehl's bank account that she maintains in Connecticut and all payments were automatically withdrawn from the same account.

81.     While residing in Florida, Plaintiff Biehl later took out an additional loan from Spotloan in December 2018 for $400.00 with an interest rate of 460%.

82.     The loan was deposited directly into Plaintiff Biehl's bank account that she maintains in Connecticut and all payments were automatically withdrawn from the same account.

83.     To pay off the loan, Plaintiff Biehl would need to pay $1,516.20 according to the payment schedule. Ms. Biehl made over $1,000 worth of payments, but has stopped making payments with over $400 remaining on her balance.

84.     During the course of her payments, Plaintiff Biehl returned to residing in Connecticut.

## **CLASS ACTION ALLEGATIONS**

85.     Plaintiffs Gross and Biehl assert their Connecticut claims individually and on behalf of the proposed Connecticut Class defined as follows:

> All Connecticut residents who entered into a loan agreement with BlueChip.

86.     Plaintiff Biehl also asserts her Florida claims individually and on behalf of the proposed Florida Class defined as follows:

All Florida residents who entered into a loan agreement with BlueChip.

87.     Plaintiffs Gross and Biehl also assert claims on behalf of the proposed RICO Class defined as follows:

> All United States residents who entered into a loan agreement with BlueChip.

## A.     Numerosity

88.     At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the volume of Defendants' business, there are likely thousands of members of each Class. Thus, the Classes are so numerous that joinder of all members is impracticable.

## B.     Commonality

89.     There are numerous questions of law and fact common to Plaintiffs and the members of the Classes. These questions include, but are not limited to, the following:

     a.     Whether BlueChip violated Connecticut's usury and licensing laws;

     b.     Whether BlueChip violated Florida's usury and licensing laws;

     c.     Whether Defendants are protected by tribal sovereign immunity;

     d.     Whether Defendants constitute an "enterprise" under RICO;

     e.     Whether Defendants violated RICO by charging interest rates more than twice the legal limit under state law;

     f.     the scope of any prospective relief; and

     g.     The proper measure and amount of damages for the Classes.

## C.     Typicality

90.     Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Each Plaintiff, like members of the Classes, took out usurious loans from Defendants. Thus,

Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

**D.      Adequacy**

91.      Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating rent-a-tribe cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with the Classes.

**E.      Injunctive Relief**

92.      The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**F.      Predominance and Superiority**

93.      The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain

members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

        a.      Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

        b.      It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

        c.      A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

        d.      The lawsuit presents no difficulties that would impede its management by the Court as a class action.

        e.      Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. §§ 1962(c)**
**(On Behalf of All Plaintiffs and the RICO Class)**
**(Class Claims against BlueChip)**

94.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

95.     BlueChip is a "person" as that term is defined in 18 U.S.C. § 1964(3).

96.     The Enterprise, consisting of each named Defendant, Douglas Merrill, ZestFinance, and the unnamed officers, executives, and other employees of BlueChip and ZestFinance, are in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated

for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Spotloan.

97.     The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

98.     BlueChip violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

99.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

100.    All of the loans made to the RICO Class members and collected by BlueChip included an interest rate far in excess of twice the enforceable rate in their states.

101.    Plaintiffs and the RICO Class members were injured as a result of BlueChip's violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

102.    This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future, to the detriment of consumers in Connecticut and other states with similar lending laws.

103.    Accordingly, BlueChip is liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. §§ 1962 (d)**
**(On Behalf of All Plaintiffs and the RICO Class)**
**(Class Claim against BlueChip)**

104.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

105.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

106.    BlueChip is a "person" as that term is defined in 18 U.S.C. § 1964(3).

107.    The Enterprise, consisting of each named Defendant, Douglas Merrill, ZestFinance, and the unnamed officers, executives, and other employees of BlueChip and ZestFinance, are in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Spotloan.

108.    BlueChip violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. BlueChip knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

109.    This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future, to the detriment of consumers in Connecticut and other states with similar lending laws.

110.    Accordingly, BlueChip liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Violation of Connecticut Usury and Licensing Laws**
**(On behalf of All Plaintiffs and the Connecticut Class)**
**(Class Claim against BlueChip)**

111.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

112.    Under Connecticut law, the maximum allowable interest rate on a consumer loan is 36% per annum. Conn. Gen. Stat. Ann. § 36a-558(d)(1).

113.    All of the Spotloan loans made to Connecticut borrowers had an annual interest rate well in excess of 36%.

114.    In order to charge 36% per annum, a person must obtain a small loan license from the Commissioner of Connecticut's Department of Banking. Conn. Gen. Stat. Ann. § 36a-556(a)(1)-(2), (4).

115.    If a person fails to obtain a license prior to making a small loan or makes a licensed small loan in excess of 36% APR, "[s]uch small loan shall be void and no person shall have the right to collect or receive any principal, interest, charge or other consideration thereon." Conn. Gen. Stat. Ann. § 36a-558(d)(1).

116.    BlueChip was never licensed to make consumer loans in Connecticut, rendering each of the loans made to Plaintiffs and Connecticut Class members void.

117.    Additionally, even if they were licensed, BlueChip's loans far exceed the 36% cap provided in Conn. Gen. Stat. Ann. § 36a-558(d)(1).

118.    Accordingly, BlueChip's loans are null and void, and it was unlawful for BlueChip or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs and the proposed Connecticut Class members. Conn. Gen. Stat. Ann. § 36a-558(d)(1).

### FOURTH CAUSE OF ACTION
**Violations of Florida Usury Law**
**(On Behalf of Plaintiff Biehl and the Florida Class)**
**(Class Claim against BlueChip)**

119.    Plaintiff Biehl realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

120.    All of the loans made by Defendants to Florida consumers used an interest rate greater than eighteen percent (18%).

121.    Fla. Stat. § 516.02(c) provides that "[a] loan for which a greater rate of interest or charge than is allowed by this chapter has been contracted for or received, wherever made, is not enforceable in this state." BlueChip's loan agreements violated Fla. Stat. § 516.02 because they contained interest rates greater than 18%.

122.    BlueChip's loan agreements violated the criminal usury provisions of Fla. Stat. § 687.071 because they contained interest rates greater than twenty five percent (25%). Such loans are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

123.    Plaintiff Biehl and Florida Class members are entitled to disgorgement of twice the amount of such usurious interest that was paid. Fla. Stat. § 687.04.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On behalf of All Plaintiffs and All State Classes)**
**(Class Claims against BlueChip)**

124.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

125.    Plaintiffs and class members conferred a benefit on BlueChip when they made payments on loans that were void or made payments of interest beyond the amounts legally collectible under state law.

126.    To the detriment of Plaintiffs and class members, BlueChip has been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from residents of Connecticut.

127.    As between the parties, it would be unjust for BlueChip to retain the benefits attained by their actions. Accordingly, Plaintiffs seek a full accounting and restitution of BlueChip enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## SIXTH CAUSE OF ACTION
### CIVIL CONSPIRACY
### (On behalf of All Plaintiffs and All State Classes)
### (Class Claims against BlueChip)

128.    All of the loans to consumers in the name of BlueChip violated Plaintiffs' and class members' respective states' interest rates and lending laws.

129.    BlueChip conspired with ZestFinance and Doug Merrill among others to violate state usury and lending laws and profit from those violations.

130.    Accordingly, on behalf of themselves and all other consumers similarly situated, Plaintiffs seek to recover from BlueChip all amounts repaid on any loans with BlueChip.

## SEVENTH CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(c)-(d)
### (On behalf of all Plaintiffs and the RICO Class)
### (Class Claims against Tribal Officials in their official capacity)

131.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

132.    Defendants Azure, Gourneau, LaFountain, Baker, Davis, Trottier, Jerome, Belgarde, and Counts are each being sued in their official capacities as members of the Turtle Mountain Tribal Council and will be referred to collectively as the "Tribal Council Defendants."

133.    Each of the Tribal Council Defendants is a "person" as that term is defined in 18 U.S.C. § 1964(3).

134.    The Enterprise, consisting of the Tribal Council Defendants, ZestFinanace, Douglas Merrill, and BlueChip and the unnamed officers, executives, and other employees of

these companies, are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States.

135.   The Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

136.   The Tribal Council Defendants violated and continue to violate 18 U.S.C. § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

137.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

138.   All of the loans made to RICO Class members and collected by the Enterprise, and others included interest rates far in excess of twice the enforceable rate in the Class members' states.

139.   Plaintiffs and RICO Class members were injured as a direct result of the Tribal Council Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

140.   This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future to the detriment of consumers in Connecticut and other states with similar usury laws.

141.   The Tribal Council Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each of the Tribal Council Defendants knowingly

agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

142.    Plaintiffs and RICO Class members were injured as a direct result of the Tribal Council Defendants' violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

143.    This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future to the detriment of consumers in Connecticut, Florida and other states with similar usury laws.

144.    The Tribal Council Defendants participated and continue to participate in the collection of the unlawful debt by aiding, abetting, procuring proceeds from the Enterprise, and willfully investing money for the purpose of the unlawful scheme.

145.    Plaintiffs seek prospective injunctive and declaratory relief for the Tribal Council Defendants' conduct, including an order: (1) barring the Tribal Council Defendants from continuing their current lending practices; (2) prohibiting them from engaging in the collection of unlawful debt; (3) requiring them to ensure that all accounts are deleted from consumers' credit reports; and (4) ordering dissolution or reorganization of BlueChip.

**EIGHTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On behalf of All Plaintiffs and All State Classes)**
**(Class Claims against Tribal Officials in their official capacity)**

146.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

147.    Connecticut, Florida, and many other states require all who engage in the business of making small loans to be licensed.

148.     BlueChip was not licensed to make loans in Connecticut, Florida, or any other state in the United States.

149.     Because the loans were made without the required license and charged excessive interest rates, the loans are null and void in Connecticut and Florida, as well as many other states.

150.     In addition to licensing violations, BlueChip's loans violated the general usury laws of many states including Connecticut and Florida. Thus, the loans violated the general usury statutes of many states and are void pursuant to state usury laws.

151.     Further, the lending agreements used for Plaintiffs contained unconscionable choice of law and forum-selection provisions that are void and unenforceable.

152.     Accordingly, Plaintiffs on behalf of themselves and the class members seek a determination that their loans were void and unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.      An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

C.      An Order declaring that Defendants have committed the violations of law alleged herein;

D.      An Order providing for any and all injunctive relief the Court deems appropriate;

E.      An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.      An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.      An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.      Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

RESPECTFULLY SUBMITTED AND DATED this 26th day of September, 2019.

Daniel S. Blinn, Bar No. ct02188
CONSUMER LAW GROUP, LLC
35 Cold Spring Rd., Suite 512
Rocky Hill, CT 06067
T. 860.571.0408
F. 860.571.7457
dblinn@consumerlawgroup.com

E. Michelle Drake*
John G. Albanese*
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
T. (612) 594-5999
F. (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell*
Jennifer Rust Murray*
Elizabeth A. Adams*
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103

T. (206) 816-6603
F. (206) 319-5450
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
eadams@terrellmarshall.com

Matthew Wessler*
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
T. (202) 888-1741
F. (202) 888-7792
matt@guptawessler.com

Kristi C. Kelly*
Andrew J. Guzzo*
Casey S. Nash*
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
T. (703) 424-7572
F. (703) 591-0167
kkelly@kellyguzzo.com
aguzzo@kellyguzzo.com
casey@kellyguzzo.com

Leonard A. Bennett*
Elizabeth W. Hanes*
Craig C. Marchiando*
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
T. (757) 930-3660
F. (757) 930-3662
lenbennett@clalegal.com
elizabeth@clalegal.com
craig@clalegal.com

*pro hac vice forthcoming

ATTORNEYS FOR PLAINTIFFS